2021R00164/KMR/DVS

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Madeline Cox Arleo |
| | : | |
| v. | : | Crim. No. 22-434(MCA) |
| | : | |
| MICHAEL DENICOLA | : | 18 U.S.C. § 1349 |
| | : | 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) |
| | : | 18 U.S.C. § 922(g) |

## INFORMATION

The defendant having waived in open court prosecution by Indictment and any challenge to venue in the District of New Jersey, the United States Attorney for the District of New Jersey charges:

### COUNT ONE
### (Conspiracy to Commit Health Care Fraud)

1. Unless otherwise indicated, at all times relevant to this Information:

a. Defendant MICHAEL DENICOLA was a resident of New York and Florida and a licensed Doctor of Podiatric Medicine ("podiatrist").

b. DENICOLA was a registered practitioner with the United States Drug Enforcement Administration ("DEA"), which allowed him to write prescriptions for Schedule II controlled substances so long as they were in the usual course of professional practice and for a legitimate medical purpose.

c. DENICOLA worked at various locations in New York and New Jersey including at offices located on Madison Avenue in New York, New York.

## Background

2. The National Railroad Passenger Corporation ("Amtrak") was a passenger railroad service that operated a nationwide rail network.

3. Amtrak provided its employees with a health care benefit plan (the "Amtrak health care plan"), which insured participating Amtrak employees who paid premiums through monthly payroll deductions (the "Amtrak health care plan participants"). Amtrak's health care plan is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

4. The Amtrak health care plan reimbursed providers of medical services, including physicians and medical clinics (collectively, "providers"), that treated Amtrak health care plan participants.

5. The Amtrak health care plan required providers to submit claim forms to receive reimbursement for medical services provided to Amtrak heath care participants. Among other information, providers were required to include in the claim forms: (1) the Amtrak health care plan participant's name and ID number; (2) the type of service provided; (3) the date the service was provided; (4) the charge for the service; (5) the diagnosis; and (6) the provider's name and/or identification number.

6. The Amtrak health care plan paid only medically necessary claims for patients covered under the health care plan. To encourage patients to receive cost-effective and medically necessary treatments, the Amtrak health care plan required participants to pay co-insurance, co-payments, and deductibles.

7. "Company-1" was the administrator of Amtrak's health care plan and processed claims for the plan. Plan participants had access to their claims information via the Company-1 website and mobile application.

8. "CC-1" was a resident of New Jersey and a medical doctor who worked with defendant DENICOLA.

9. "Individual-1" was a resident of New York and patient of defendant DENICOLA.

## The Conspiracy

10. From in or around 2019 through in or around August 2021, in the District of New Jersey, and elsewhere, defendant

**MICHAEL DENICOLA**

did knowingly and intentionally conspire and agree with others to execute a scheme and artifice to defraud the National Railroad Passenger Corporation (Amtrak) Healthcare Plan, a health care benefit program as defined under Title 18, United States Code, Section 24(b), and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

In violation of Title 18, United States Code, Section 1349.

## Goal of the Conspiracy

11. The goal of the conspiracy was for defendant DENICOLA and his co-conspirators to profit by submitting false and fraudulent claims to the Amtrak

health care plan for services that were either never provided or that were medically unnecessary.

## Manner and Means of the Conspiracy

12. It was part of the conspiracy that:

a. In or around 2019, defendant DENICOLA, CC-1, and others agreed to engage in a scheme to bill the Amtrak health care plan for false and fraudulent claims for services that either were never provided or were medically unnecessary.

b. Defendant DENICOLA and CC-1 agreed that DENICOLA and others would recruit Amtrak employees to participate in the scheme by paying them to allow DENICOLA, CC-1, and others to use their patient and insurance information to submit false and fraudulent claims.

c. Defendant DENICOLA recruited Amtrak employees who were Amtrak health care plan participants to the scheme and paid them in return for their agreement to participate. Defendant DENICOLA and others also paid Amtrak employees for recruiting additional Amtrak health care plan participants to participate in the scheme.

d. Defendant DENICOLA, CC-1, and others knowingly submitted and caused to be submitted false and fraudulent claims to the Amtrak health care plan, via Company-1.

e. Defendant DENICOLA, CC-1, and others profited by receiving reimbursement payments from the Amtrak health care plan, via Company-1, for services that were not rendered or that were medically unnecessary.

f. As a result of the false and fraudulent claims that DENICOLA and CC-1 submitted and caused to be submitted to the Amtrak health care plan, Amtrak paid at least approximately $1,655,516.

**COUNT TWO**
**(Distribution of Controlled Substances)**

13. The allegations set forth in the preceding paragraphs are realleged here.

14. Unless otherwise indicated, at all times relevant to this Information:

a. The Controlled Substances Act ("CSA"), codified in Title 21 of the United States Code, and its promulgating regulations, classified drugs into five schedules depending on a drug's acceptable medical use and its potential for abuse and dependency.

b. Schedule I controlled substances, such as heroin, did not have an acceptable medical use in the United States. Schedule II through Schedule V controlled substances had acceptable medical uses.

c. Schedule II controlled substances, such as oxycodone, had acceptable medical uses but were severely restricted. Schedule II drugs had a high potential for abuse, which could lead to severe psychological or physical dependence. Oxycodone was an opioid pain medication and had a high potential for abuse and risk of fatal overdose.

d. Title 21, United States Code, Section 841(a)(1), provided that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, a controlled substance."

e. Title 21, United States Code, Section 802(10), provided that the term "dispense" meant "to deliver a controlled substance to an ultimate user . . . by,

or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery." Title 21, United States Code, Section 802(21), provided that "'practitioner' means a physician . . . ."

f. The CSA authorized Schedule II controlled substances to be dispensed to individuals by a valid prescription. 21 U.S.C. § 829.

g. For a prescription for a controlled substance to be valid, it must be issued for a legitimate medical purpose by a registered practitioner acting in the usual course of his or her professional practice. 21 C.F.R. § 1306.04 ("An order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of [21 U.S.C. § 829]").

h. In addition to requirements imposed by States such as New York and New Jersey, physicians or practitioners must obtain and maintain a registration with the DEA authorizing them to prescribe controlled substances in the Schedules in which they are registered. 21 U.S.C. § 1306.03. Consequently, a registered practitioner issuing prescriptions for controlled substances not in the usual course of professional treatment and not for a legitimate medical purpose violates the provisions of the CSA and is subject to its penalties. 21 C.F.R. § 1306.04.

15. Defendant DENICOLA provided oxycodone prescriptions to Individual-1 in return for Individual-1's agreement to allow his patient and insurance information to be used for the submission of false and fraudulent insurance claims.

Defendant DENICOLA also provided oxycodone prescriptions to others, at the direction of Individual-1. Defendant DENICOLA issued these prescriptions outside the usual course of professional treatment and without a legitimate medical purpose.

16. From in or around April 2017 through in or around February 2018, Defendant DENICOLA issued approximately 64 oxycodone prescriptions at Individual-1's direction.

17. On or about January 29, 2018, in the Southern District of New York, and elsewhere, defendant

**MICHAEL DENICOLA**

a licensed podiatrist, did knowingly and intentionally distribute and dispense, outside the usual course of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

**COUNT THREE**
**(Unlawful Possession of a Firearm)**

18. On or about September 1, 2019, in the Middle District of Pennsylvania and elsewhere, defendant

**MICHAEL DENICOLA**

knowing that he had previously been convicted in a court of at least one crime punishable by a term of imprisonment exceeding one year, did knowingly possess a firearm, which was manufactured by Sturm, Ruger & Co., and shipped and transported in interstate commerce.

In violation of Title 18, United States Code, Section 922(g)(1).

## FORFEITURE ALLEGATIONS

1. The allegations contained in this Information are realleged here for the purpose of alleging forfeiture, pursuant to 18 U.S.C. § 982(a)(7).

2. Upon conviction of the offenses alleged in Counts One, Two, and Three of this Information, defendant DENICOLA shall forfeit to the United States, (1) pursuant to 18 U.S.C. § 982(a)(7), all of his right, title, and interest in all property DENICOLA obtained that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the violation of 18 U.S.C. § 1349 charged in Count One of this Information, which is a Federal health care offense within the meaning of 18 U.S.C. § 982(a)(7); and (2) pursuant to 21 U.S.C. § 853, any and all property constituting or derived from any proceeds DENICOLA obtained, directly or indirectly, as the result of the violation charged in Count Two of this Information, and all of DENICOLA's right, title, and interest in any property in which DENICOLA has an interest that was used or intended to be used, in any manner or part, to commit, and to facilitate the commission of, the violation charged in Count Two of this Information, including, but not limited to, a sum of money equal to $1,394,250.

## SUBSTITUTE ASSETS PROVISION
## (Applicable to All Forfeiture Allegations)

3. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b).

PHILIP R. SELLINGER
United States Attorney

**CASE NUMBER: 22-_________**

**United States District Court**
**District of New Jersey**

**UNITED STATES OF AMERICA**

**v.**

**MICHAEL DENICOLA**

**INFORMATION FOR**

**18 U.S.C. § 1349**
**21 U.S.C. §§ 841(a)(1) and (b)(1)(C)**
**18 U.S.C. § 922(g)**

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

KATHERINE M. ROMANO
DANIEL V. SHAPIRO
ASSISTANT U.S. ATTORNEYS
NEWARK, NEW JERSEY
(973) 353-6095